UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRYAN SOUSA, | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3-05CV822 (JCH) |
| v. | : | |
| | : | |
| ARTHUR ROQUE, JR., et. al., | : | |
|     Defendants. | : | APRIL 9, 2007 |
| | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND MOTION TO STRIKE [Doc. Nos. 65 & 75]**

**I.    INTRODUCTION**

The plaintiff, Bryan Sousa ("Sousa"), a former employee of the Connecticut Department of Environmental Protection ("DEP"), brings an action against defendants Arthur Roque, Commissioner of the DEP; Robert Kaliszewski, Sousa's supervisor at the DEP; Joanne Driver, a DEP personnel officer; William Evans, a Bureau Chief of the DEP Personnel/Bureau of Financial and Support Services; and Jane Stahl, Deputy Commissioner of the DEP (collectively, "defendants"). Sousa sues each of these defendants in his or her individual capacity. In its Ruling on Defendants' Motion to Dismiss [Doc. No. 25], the court dismissed Sousa's claim for negligent infliction of emotional distress.

The defendants have filed a Motion for Summary Judgment [Doc. No. 65] seeking to dismiss all of Sousa's remaining claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. The defendants have also filed a Motion to Strike [Doc. No. 75].

1

## II. STANDARD OF REVIEW

In a motion for summary judgment, the burden lies on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Communications, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . ." Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted).  A dispute regarding a material fact is genuine, "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992)).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich,

963 F.2d at 523 (internal citation omitted).  Thus, "'[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper.'"  Id. (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991)); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992) ("Viewing the evidence in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is inappropriate.").  "'If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'"  Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading."  Fed. R. Civ. P. 56(e); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment.  Id.  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted).  Similarly, a party may not rely on conclusory statements or an

argument that the affidavits in support of the motion for summary judgment are not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## III.    FACTUAL BACKGROUND[1]

Sousa was employed at DEP from July 1987 until February 3, 2005, working as a supervising sanitary engineer in the Water Bureau from 1995 until August 2003, when he transferred to the Ombudsman's office. See Def.'s Loc.R.Civ.P. 56(a)1 Statement ("Def.'s Stat.") at ¶ 1 [Doc. No. 65]. On October 31, 2002, Sousa was involved in a verbal and physical altercation with Jonathan Goldman, a lower-level employee. Id. at ¶¶ 9, 11. As a result of this incident, Sousa and Goldman were suspended three days without pay. Id. at ¶ 12. Both employees grieved their suspensions, which were upheld after union arbitration.[2] Id. at ¶ 15.

Sousa made complaints of the discipline imposed upon him, as well as of incidents of workplace violence and of hostile work environment, including harassment

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support his allegations.

[2]The court notes that, although Sousa disagrees with this statement in his Local 56(a)2 Statement, see Plf.'s Loc.R.Civ.P. 56(a)2 Statement ("Plf.'s Stat.") at ¶ 15 [Doc. No. 71], the relevant paragraph in his cited-to Affidavit does not appear to disagree with this statement, but only with the outcome of the arbitration. See Plf.'s Exhibit A to Plf.'s Stat. ("Plf.'s Ex. A"), Sousa Aff. at ¶ 15 [Doc. No. 73] ("Yes, the discipline taken against me was indeed upheld during an arbitration, however, the decision was unjust . . . ."). This response is challenged by the defendants in the Motion to Strike, at 6. The court notes that the plaintiff disagrees with much of the defendants' Local 56(a)1 Statement, but the evidence cited indicates in fact that the plaintiff is in agreement with many of the facts contained therein, just not with their bases. Because such disagreements do not evidence a dispute of fact, the court will deem those to be admissions. To simplify the reading of this Ruling, the court will only articulate those instances where it finds the plaintiff has actually disputed an issue of fact.

against him ("mobbing")[3] as well as between two lower-level employees.[4]  Id. at ¶¶ 20-22.  He complained to Marcia Bonito, DEP's Affirmative Action Officer, and to the Attorney General about these incidents.  Id. at ¶¶ 23-24.  Sousa sought, and was granted, effective August 22, 2003, a transfer from the Water Bureau to the Ombudsman's unit within the Commissioner's Office, which moved Sousa from the second to the third floor of the building.  Id. at ¶¶ 27, 29, 36.

On July 23, 2003, Sousa emailed Karen Caliendo and Lisa Piccarello regarding providing a book on mobbing to members of the Workplace Violence Threat Assessment Team ("TAT").  Id. at ¶ 31; see also Plf.'s Stat. at Ex. A, ¶ 31.  In the email, Sousa suggested Joanne Driver, a Principal Personnel Officer within the Human Resources Division of DEP, should excuse herself from the committee based on what Sousa perceived to be a conflict of interest:

> Joanne (Driver), have you given any thought to excusing yourself from the TAT due to the seriousness of the situation and my concern of your having a conflict of interest?  When you read the book you will recognize that mobbing can often result in the death of the victim, either due to illness, accident or suicide.  Another reference suggested that, in light of such ramifications, workplace mobbing should be viewed as the last remaining legal means of committing homicide.  I personally see it as a form of group vigilantism.

Plf.'s Ex. A at ¶ 31.  Subsequent to this email, on August 12, 2003, HR sent Sousa a letter requiring him to undergo a fitness for duty evaluation.  See Def.'s Stat. at ¶ 33.

---

[3] Mobbing has been defined as "a process of abusive behaviors inflicted over time.  It begins insidiously, and soon gains such momentum that a point of no return is reached."  See Plf.'s Ex. 93, DAS Report (citing Noa Davenport, Mobbing: Emotional Abuse in the American Workplace 38 (2d ed. 2002).

[4] The court notes that Sousa claims he had made complaints prior to the altercation with Goldman.  See Plf.'s Ex. A, Sousa Aff. at ¶ 20.

5

According to the defendants, an employee who must submit a fitness for duty evaluation is immediately put on administrative leave; however, the defendants did not place him on administrative leave while he was being evaluated because he was about to transfer to the Ombudsman's unit. Id. at ¶¶ 34-35.

After his transfer, Sousa was directly supervised by Jo-Ann Smith and indirectly supervised by Robert Kaliszewski. Id. at ¶ 37. Sousa's first assignment was to provide a review of the general permits issued by the Agency. Id. at ¶ 39. After a positive start, Sousa began to receive negative feedback on his work product. Id. at ¶¶ 40-41. Sousa also began complaining to his supervisors about his "mobbing" concerns and their involvement with it, and emailed Bonito similar concerns, who met with Kaliszewski. Id. at ¶¶ 41-43; see also Plf.'s Ex. A at ¶ 41. Kaliszewski and Smith then met with Sousa on September 25, 2003, and the meeting appears to have involved much tension between Sousa and his supervisors. See Def.'s Stat. at ¶¶ 44-48; Plf.'s Ex. A at ¶¶ 44-48. After the meeting, Kaliszewski met with William Evans to find out the results of Sousa's fitness for duty evaluation, which results had not been received. See Def.'s Stat. at ¶¶ 49-50; Plf.'s Ex. A at ¶ 50.

Sousa did not work in October and November 2003, as well as part of December 2003. See Def.'s Stat. at ¶ 51. On September 29, 2003, Sousa was put on paid leave, and then unpaid leave on October 15, until the results of his fitness for duty evaluation were completed, since in the initial report, dated August 14, 2003, Dr. Kaloyan Tanev indicated that he did not have enough information to determine Sousa's fitness for duty and would need Sousa's prior medical records for that determination. Id. at ¶ 52, 54; Plf.'s Ex. 53, Tanev Report. At this time Sousa signed the required medical release to

6

have the physician provide the results to DEP.  See Def.'s Stat. at ¶ 52.  Sousa filed a grievance over being placed on unpaid leave on October 15, 2003, which was denied at Step III because Sousa was paid back pay for the leave once the fitness for duty was completed .  Id. at ¶ 58; see also Plf.'s Ex. 60.

Dr. Tanev found Sousa fit for duty after examining him on November 20, 2003. Id. at ¶ 59.  Evans informed Sousa that he was to report to work on December 1, 2003; however, on that day Sousa informed Evans by letter that he would not return out of concern for his own safety.  Id. at ¶¶ 60-61.  During the month of December, Sousa used a combination of sick and vacation leave.  Id. at ¶ 62; Plf.'s Ex. A at ¶ 62.  On December 11, 2003, Sousa requested, but was denied, permission to work at home on paid leave to prepare his various complaints against DEP.  See Def.'s Stat. at ¶ 65. Sousa ultimately returned to work on January 5, 2004.

On November 4, 2003, Sousa filed a complaint of reverse discrimination and First Amendment violations with Bonito, DEP's Affirmative Action Officer.  Id. at ¶ 67. Bonito investigated his complaints and found them to be without merit.  Id. at ¶ 68.  On December 10, 2003, Sousa requested Bonito to reevaluate his complaint, which Bonito again rejected on the merits.  Id. at ¶ 69.

Upon Sousa's return to work in January 2004, he requested to telecommute and/or to be transferred, which was denied by Smith and Kaliszewski.  Id. at ¶¶ 70, 72. From October 2003 through December 2004, Sousa was on some form of leave for more than ten full months.  Id. at ¶ 76.  According to the defendants, the primary problem with Sousa was getting him to come to work; any problem with his not doing the work was secondary.  Id. at ¶ 79.  Smith claims that supervising Sousa became her

7

full-time job, and that she began putting everything into writing for him. Id. at ¶ 81. Kaliszewski discussed a possible transfer to another department, and informed Sousa to direct his complaints about hostile work environment to Personnel and Affirmative Action. Id. at ¶¶ 83, 86.

In the spring of 2004, Sousa filed a union grievance regarding his hostile work environment allegations, suggesting that he be given 100 "man days" at home to prepare for the grievance. Id. at ¶ 87. He was ultimately given eight hours in the office to work on the grievance, about which Sousa was unhappy. Id. at ¶ 89, 91.

In continuing conflict with his supervisors, Sousa warned the defendants that he might bring suit if the situation worsened, and he requested that Smith no longer be his supervisor. See Plf.'s Stat. at Ex. 78. On April 19, 2004, Smith sent Kaliszewski an email indicating that she believed Sousa was "threatening and harassing me with the intent to intimidate me." See Def.'s Stat. at Ex. 9, Smith email. Kaliszewski forwarded this complaint to Personnel. Id. at ¶ 96. Smith also complained in a similar manner to Evans. Id. at ¶ 97.

In May 2004, Sousa was married and went on a honeymoon for two and one-half weeks. Id. at ¶ 99. Sousa returned to work in June 2004, although his last day in the office was June 10, 2004. Id. at ¶ 103. Shortly after Sousa's last day in the office, Smith left for six months on medical leave. Id. at ¶ 104. She claims that, because she was not sure that she would no longer work with Sousa upon her return, she transferred to another division upon her return to work in January 2005. Id. at ¶ 106.

With respect to Sousa's complaints of hostile environment and workplace violence, four investigations were conducted, including one by Devon Marquez, a

8

Department of Administrative Services ("DAS") attorney whom the DAS Deputy Commissioner had assigned pursuant to Evans' request. Id. at ¶ 110. Marquez's investigation was limited to whether DEP violated the state's zero tolerance policy regarding "threats or actual incidents of death or physical injury" on the job. See Plf.'s Ex. 93, DAS Report at 3. Marquez did not uncover any violations of this workplace violence policy, nor did he believe that any DEP employee harassed Sousa, although he indicated that whether Sousa's complaints constituted "mobbing" was not within the scope of his investigation. Id. Among the other three investigations that were conducted, Commissioner Rocque asked Bonito to look into Sousa's complaints. See Def.'s Stat. at ¶ 120.

Sousa was not eligible for Family Medical Leave Act ("FMLA") leave because he had worked insufficient hours in 2004. Id. at ¶¶ 122-23. After his last day in the office on June 10, 2004 and through January 2005, the defendants communicated with Sousa regarding his various paid leave requests. Id. at ¶ 124. After having approved a period of paid sick leave pursuant to a doctor's medical examination, Sousa was informed he was to return to work on October 18, 2004, or he would be placed on unauthorized leave without pay. Id. at ¶ 146. Sousa did not show up at DEP on that date, and after five days a Laudermill hearing was set for November 17, 2004. Id. at ¶ 149.

The independent medical examiner indicated by letter on December 14, 2002 that Sousa was fit for duty as of December 20, 2004, but recommended he be permitted to telecommute for the first four weeks of his return to work, although she indicated this would be solely within the discretion of the DEP. Id. at ¶ 153, 155. The

9

DEP rejected the telecommuting accommodation. Id. at ¶ 159. Sousa did not return to work on December 20, 2004. Id. at ¶ 160; see also Plf.'s Ex. A at ¶ 160. A second Loudermill hearing was held on January 14, 2005, based in part on Sousa's absence without authorized leave for more than five working days. Id. at ¶ 162. Subsequently, Sousa was terminated, effective February 3, 2005, for the stated reasons of two instances of unauthorized absences and the use of abusive language. Id. at ¶ 164. Sousa grieved his termination, which the arbitrator upheld after several days of hearing. Id. at ¶ 166.

## IV. DISCUSSION

### A. First Amendment Retaliation

Sousa claims that the actions of the defendants described above – requiring him to undergo a fitness for duty evaluation on August 12, 2003; placing him on paid leave on September 29, 2003; placing him on unpaid leave on October 15, 2003; denying his continued medical leave on October 18, 2004; denying his request to telecommute, and also the Attorney General's denial of the same; denying his state (not federal) FMLA claim; subjecting him to a hostile work environment from 2003 through January 2005; and terminating him, see Plf.'s Stat. at ¶ 169 – were all done in retaliation for exercising his First Amendment right to protest the workplace violence and hostile work environment he experienced at DEP. The defendants challenge Sousa's retaliation claim on a number of grounds. Because the court concludes that Sousa's speech does not warrant First Amendment protection, the court will not decide the defendants' other challenges to Sousa's retaliation claim.

It is well-accepted that "public employees do not surrender all their First Amendment rights by reason of their employment." Garcetti v. Ceballos, __ U.S. __, 126 S. Ct. 1951, 1957 (2006). However, "[i]n measuring the extent of this right, the interests that must be carefully balanced are the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). "In order to establish a First Amendment claim of retaliation as a public employee, [a plaintiff] must show that (1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action." Konits v. Valley Stream Cent. High School Dist., 394 F.3d 121, 124 (2d Cir. 2005) (internal quotation marks omitted).

The first question the court must ask in deciding a First Amendment retaliation claim is whether the public employee spoke "as a citizen upon matters of public concern" or "as an employee upon matters of personal interest." Connick v. Myers, 461 U.S. 138, 147 (1983); see also Melzer v. Bd. of Ed., 336 F.3d 185, 193 (2d Cir. 2003). If the court finds that the employee spoke as an employee on a matter of personal interest, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Garcetti, 126 S. Ct. at 1958.

In Garcetti, the Supreme Court focused on when a public employee speaks "as a citizen" under the First Amendment. See Garcetti, 126 S. Ct. at 1956 (finding that the Ninth Circuit erred in ignoring whether the plaintiff made the speech at issue "as a

11

citizen" and only determining that the speech addressed a matter of public concern). The Court attempted to balance "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion," with the need to avoid empowering public employees to "constitutionalize the employee grievance." Id. at 1958, 1959. Looking at the facts in Garcetti, the Court reasoned that, while relevant, the fact that the speech at issue was made inside the office, rather than publicly, and that the speech concerned the subject matter of the speaker's employment, were not dispositive. Id. at 1959. The Court ultimately found that the "controlling factor" in the case was that the speaker's "expressions were made pursuant to his duties." Id. at 1959-60. Thus, the Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960.

Here, there is no evidence that Sousa's official duties included complaining about workplace violence or harassment.[5] As to whether Sousa's complaints addressed a matter of public concern, Sousa argues that the complaints regarding workplace violence, harassment, "mobbing," and mismanagement are inherently of public concern because "he believed that he had an obligation to taxpayers to insure that they obtained the services of a well managed and productive state agency; he also

---

[5]While Sousa does not make this argument in his Memorandum in Opposition, to the extent Sousa is basing his First Amendment retaliation claim in part on the complaints he made regarding harassment by and between two lower-level employees, the court finds that this appears to fall within his job duties as a higher-level supervising engineer. See Garcetti, 126 S. Ct. at 1956.

wanted to encourage residents who were qualified to come to work at a professional state agency." See Plf.'s Memorandum in Opposition to Summary Judgment ("Mem. in Opp.") at 5 [Doc. No. 72]. The defendants respond by arguing that employee grievances dealing only with an employee's personal working conditions do not constitute matters of public concern. See Def.'s Memorandum in Support of Summary Judgment ("Mem. in Supp.") at 17.

While looking to the record as a whole, a court must analyze the content, form, and context of an employee's speech in order to decide whether it addresses an issue of public concern. Connick, 461 U.S. at 147-48. In the present case, Sousa's complaints regarding workplace violence and harassment seek only personal relief for Sousa's treatment by the defendants; indeed, Sousa's complaints are essentially grievances against his supervisors, and his complaints, even if made public, "would convey no information at all other than the fact that a single employee is upset with the status quo." Connick, 461 U.S. at 148. And, where the employee's private motives are expressed in the context of an employee grievance, the Second Circuit has consistently held that the speech at issue does not address a matter of public concern. Reuland v. Hynes, 460 F.3d 409, 417 (2d Cir. 2006) (citing Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 781 (2d Cir. 1991) and Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999)).

That Sousa complained of treatment that could be construed as unconstitutional discrimination[6] does not transform Sousa's complaints into speech on an issue of public

---

[6]The court finds that the only parts of Sousa's complaints that could be construed as unconstitutional discrimination are his complaints regarding reverse discrimination or race-

concern. See Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993) (finding that an employee's complaints of sexual discrimination against only her were not of public concern). Rather, the content of his complaints brings the court to conclude that Sousa was "motivated by and dealt with [his] individual employment situation." Id.

The court finds that Sousa's expression of dissatisfaction with his treatment, including his theory of "mobbing," is the essence of an employee grievance. There is no First Amendment protection for speech calculated to redress personal grievances in the employment context. Lewis v. Cohen, 165 F.3d 154, 163-64 (2d Cir. 1999). Therefore, the court grants summary judgment on Sousa's retaliation claim.

### B.    Equal Protection[7]

Sousa argues that he was denied the opportunity to telecommute and he was ordered to undergo a fitness for duty examination in 2003, which he claims to be an Equal Protection violation. The defendants challenge Sousa's Equal Protection claim by arguing that Sousa has not sufficiently shown himself to be similarly situated to other DEP employees. The court agrees.

Because Sousa does not claim to be a member of a protected group, he may only pursue his Equal Protection claim under the so-called "class of one" analysis.

---

based harassment; allegations of workplace violence and harassment not based on a protected category are not constitutionally protected.

[7]In his Memorandum in Opposition, Sousa sets forth an Equal Protection "class of one" argument, even though the defendants had not addressed this claim in their Memorandum in Support. Because the defendants address this argument in their Reply Memorandum [Doc. No. 74], the court will briefly address this issue.

Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). To prevail on a "class of one" equal protection theory, Sousa must show that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. A plaintiff's burden on a "class of one" claim is "extremely high," and a plaintiff cannot prevail absent a prima facie showing that he is identical in all relevant respects to the individuals with whom he compares himself. Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (citing Purze v. Village of Winthrop Harbar, 286 F.3d 452, 455 (7th Cir. 2002)).

In the instant case, Sousa compares himself to "at least 144 state employees" who were permitted to telecommute in 2005, and he mentions the "state policy" of referring employees to the EAP program. However, the court finds that these comparisons are insufficient as a matter of law. Sousa has not shown how he is similar to any one of the 144 state employees with whom he is comparing himself; indeed, he does not indicate what job positions these employees held, why they were permitted to telecommute, and for what agencies they worked. Thus, Sousa has not satisfied the high burden that is required for "class of one" claims. See Neilson, 409 F.3d at 104. As for Sousa's fitness for duty argument, Sousa has provided no comparators for this claim, which therefore also fails. Thus, the court finds that Sousa has not sufficiently shown himself to be identical in all relevant respects to any of the persons with whom he may compare himself. The court therefore grants summary judgment on this claim.

## C. Intentional Infliction of Emotional Distress

Since this court grants summary judgment to the defendants on all of Sousa's federal claims, it will decline to exercise supplemental jurisdiction over Sousa's state law claim of intentional infliction of emotional distress. See 28 U.S.C. § 1367(c)(3).

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment [**Doc. No. 65**] is GRANTED. Despite the plaintiff's legally insufficient Memorandum in Opposition to the defendants' Motion to Strike, which contained in its entirety one sentence,[8] the court has considered all the evidence in making its Ruling, and thus the defendants' Motion to Strike [**Doc. No. 75**] is DENIED.

The clerk is ordered to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 9th day of April, 2007.

      /s/ Janet C. Hall
      Janet C. Hall
      United States District Judge

---

[8] "The plaintiff objects to the defendants' motion to strike his responses to their Rule 56(a)(1) Statement, and relies upon the judgment of the Court to assess the merit of his responses to the defendants' Statement of Material Facts Not in Dispute." See Plf.'s Mem. in Opp. to Motion to Strike [Doc. No. 76].