UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRYAN SOUSA, : | |
|     Plaintiff, : | CIVIL ACTION NO. |
| : | 3:05-CV-822 (JCH) |
| v. : | |
| : | |
| ARTHUR ROQUE, JR., et. al., : | |
|     Defendants. : | MARCH 18, 2010 |
| : | |

**RULING RE: DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (Doc. No. 65)**

**I.    INTRODUCTION**

Bryan Sousa ("Sousa"), a former employee of the Connecticut Department of Environmental Protection ("DEP"), brings this suit against Arthur Roque, Commissioner of the DEP; Robert Kaliszewski, Sousa's supervisor at the DEP; Joanne Driver, a DEP personnel officer; William Evans, a Bureau Chief of the DEP Personnel/Bureau of Financial and Support Services; and Jane Stahl, Deputy Commissioner of the DEP (collectively, "defendants").  Sousa originally filed this action on May 24, 2005, alleging that the defendants violated his First Amendment rights by retaliating against him for comments he made "regarding primarily workplace violence."  Sousa v. Roque, 578 F.3d 164, 166 (2d Cir. 2009).  Sousa also brought a federal Equal Protection claim, and state claims for negligent infliction of emotional distress and intentional infliction of emotional distress.  On July 7, 2005, the defendants moved to dismiss Sousa's state claims (Doc. No. 6).  In a December 19, 2005 Ruling, this court dismissed Sousa's

claim of negligent infliction of emotional distress; it did not dismiss Sousa's claim of intentional infliction of emotional distress (Doc. No. 25).

The defendants moved for summary judgment on all of Sousa's remaining claims on December 20, 2006 (Doc. No. 65).  In a Ruling dated April 10, 2007, this court granted the Motion for Summary Judgment in its entirety (Doc. No. 79) (hereinafter "April 10 Ruling").  See Sousa v. Roque, 2007 WL 1100318 (D. Conn. April 10, 2007).  The court held that Sousa's retaliation claim failed as a matter of law because Sousa was not speaking on a "matter of public concern."  Id. at *7.  As to Sousa's Equal Protection claim, the court held that Sousa failed to show that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Id. (citing Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).  Because it granted summary judgment to the defendants on both of Sousa's federal claims, the court declined to reach certain of the defendant's arguments or to exercise supplemental jurisdiction over Sousa's remaining state claim for intentional infliction of emotional distress.  Id. at *8.

On April 26, 2007, Sousa appealed the April 10 Ruling (Doc. No. 81).  In an Opinion dated August 21, 2009, the Second Circuit remanded the case, vacating this court's judgment as to Sousa's retaliation claim.[1]  Sousa, 578 F.3d at 166.  Specifically, the Second Circuit held that this court "erred in concluding that Sousa's speech did not address a matter of public concern because he was motivated by employee grievances."  Id.  On October 22, 2009, the defendants moved to Reclaim and to

---

[1] The Second Circuit did not reverse the April 10 Ruling's grant of summary judgment to the defendants on Sousa's Equal Protection claim.  This Ruling does not revisit that claim.

Supplement their Motion for Summary Judgment (Doc. No. 91). That Motion was granted on October 23, 2009 (Doc. No. 92). On November 11, 2009, Sousa filed a Supplementary Memorandum in Opposition (Doc. No. 94).

This court herein addresses the defendants' renewed Motion for Summary Judgment, in light of the Second Circuit's August 21 opinion. For the reasons that follow, the Motion is granted.

## II.     STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.' " Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a

3

reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir.2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere " 'scintilla' " of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

### III. DISCUSSION[2]

#### A. First Amendment Retaliation

Sousa alleges that the defendants retaliated against him, in violation of his First Amendment rights. "Although a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment, these rights are not absolute, because the government, as an employer, has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services." Mandell v. County of Suffolk, 316 F.3d 368, 382 (2d Cir. 2003) (citations and internal quotation marks omitted). To establish a claim of retaliation in violation of the First Amendment, a plaintiff must show that "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination." Id. (citation and internal quotation marks omitted). In the April 10 Ruling, this court granted

---

[2] For purposes of the instant Ruling, the court assumes familiarity with the facts of this case, which were recounted by both this court in the April 10 Ruling, and by the Second Circuit in its August 21, 2009 Opinion. As in all rulings on motions for summary judgment, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving party, where there is evidence to support that party's allegations.

4

summary judgment in favor of the defendants on the ground that Sousa's speech at issue was not on a matter of public concern.  See Sousa, 2007 WL 1100318, at *7. The Second Circuit, however, held that this court "erred in concluding that Sousa's speech did not address a matter of public concern because he was motivated by employee grievances."  Sousa, 589 F.3d at 174.  Remanding the case, the Second Circuit emphasized that, " 'the speaker's motive, while one factor that may be considered, is not dispositive as to whether his speech addressed a matter of public concern.' "  Id. at 175 (quoting Reuland v. Hynes, 460 F.3d 409, 415 (2d Cir. 2006)).

While this court would ordinarily revisit the "public concern" issue in light of the Second Circuit's reversal, the Second Circuit "note[d] that as part of the District Court's proceedings, it may wish to assume arguendo that Sousa's statements did touch on 'a matter of public concern,' and proceed straight to 'Pickering balancing,'--that is, considering whether Sousa's 'interest in free comment is outweighed by the State's interest in the efficiency of its public services.' "  Sousa, 589 F.3d at 175 n.8 (citation omitted).  This court heeds the Second Circuit's suggestion.  For purposes of this Ruling, the court assumes, arguendo, that Sousa has satisfied the "matter of public concern" standard required to make out a case of illegal retaliation.  The court will therefore address the Pickering balancing analysis.

Once the plaintiff has established a prima facie case for First Amendment retaliation, the government may avoid liability by showing "that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression." Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004).  This is known as Pickering balancing.  See

5

Pickering, 391 U.S. at 568 ("The problem in any case is to arrive at a balance between the interests of [the employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

"As a general rule, the application of the [Pickering] balancing test is a question of law which is properly performed by the district court." Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 557 (2d Cir. 2001) (citing Lewis v. Cowen, 165 F.3d 154, 164 (2d Cir. 1999). Notably, however, a grant of summary judgment is inappropriate in cases

> in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the court's application of the Pickering balancing test.

Vasbinder v. Ambach, 926 F.2d 1333, 1340 (2d Cir.1991). In this case, the court concludes that Sousa has not set forth any specific facts that preclude application of the Pickering balancing analysis at this stage of the litigation.[3]

1.    Sousa's Interest in Commenting

"Public employees do not surrender their First Amendment free speech rights by working for the state." Knight v. Conn. Dep't of Pub. Health, 275 F.3d 156, 163 (2d Cir. 2001). At the same time, however, a state employee's right to speak freely is not unlimited. As the Second Circuit has recognized, "[t]he state's role as sovereign

---

[3] As it noted in the April 10 Ruling, the court emphasizes that, while Sousa "disagrees with much of the defendants' Local 56(a)1 Statement, the evidence cited indicates in fact that the plaintiff is in agreement with many of the facts contained therein, just not with their bases. Because such disagreements do not evidence a dispute of fact, the court will deem those to be admissions." Sousa, 2007 WL 1100318, at *2 n.2.

constrains its ability to regulate speech, while its role as employer provides the 'State with greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions.' " Id. (quoting Lewis, 165 F.3d at 161). In light of these principles, the court must first determine "the First Amendment value of [Sousa's] speech." Locurto v. Safir, 264 F.3d 154, 166 (2d Cir.2001); see also Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991) ("[T]he employer's burden in justifying a particular discharge varies depending upon the nature of the employee's expression."); Melzer v. Board of Educ. of City School Dist. of City of New York, 196 F. Supp. 2d 229, 250 (E.D.N.Y. 2002) (stating that a court conducting a Pickering balancing analysis "must first turn to placing a value on the protected activity" in which the employee engaged).

The fact that this court has assumed arguendo that Sousa has met the "matter of public concern" standard in no way indicates that the Pickering balancing conducted by the court should ignore the "nature of [Sousa's] expression." See Connick v. Myers, 461 U.S. 138, 150 (1983). In fact, "[t]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir.1995); see also Blackman v. New York City Transit Authority, 491 F.3d 95, 99 (2d Cir. 2007). "The value [the court places on the employees' protected activity] can range from 'most limited' to one of 'significant weight.' " Melzer, 196 F. Supp. 2d at 250 (citations omitted).

In placing a value on Sousa's protected conduct, the court first considers Sousa's motivation for speaking. While the Second Circuit has clarified that Sousa's

7

motivation for speaking is not dispositive on the issue of whether his speech was on a matter of public concern, "motive surely may be one factor in making this [public concern] determination." Sousa, 578 F.3d at 175. Likewise, Sousa's motivation for speaking is one factor that affects this court's determination of the value to be placed on his protected activity, for Pickering balancing purposes. See id. at 172 ("Insofar as self-interest is found to have motivated public-employee speech, the employee's expression is entitled to less weight in the Pickering balance than speech on matter [sic] of public concern intended to serve the public interest.") (quoting Barnard v. Jackson County, 43 F.3d 1218, 1226 (8th Cir.1995)). The court does not disregard Sousa's assertion that he "believed that he had an obligation to taxpayers to insure that they obtained the services of a well managed and productive state agency." Mem. in Opp. at 5. However, construing the record in Sousa's favor, the court concludes, as it did in its April 10 Ruling, that Sousa's statements "regarding primarily workplace violence"[4] at the DEP were principally motivated by his desire to redress personal grievances, rather than to protect the public. Sousa, 2007 WL 1100318, at *7.

The court next considers the content of Sousa's speech: that is, whether Sousa's speech was "more in the nature of a private personnel dispute rather than an issue in which the public at large would be genuinely interested." Wallscetti v. Fox, 258 F.3d 662, 667 (7th Cir. 2001). In Wallscetti, a former employee of a county Department of Environmental Control alleged that she suffered unlawful retaliation after she made

---

[4] While Sousa states repeatedly that his complaints were on the subject of "workplace violence," the record reveals only one occurrence at the DEP that can reasonably be defined as "violence." See infra at p. 11 and n. 4.

8

various complaints about her supervisors. Such complaints alleged both that the supervisors had demonstrated hostility to the plaintiff, and that certain supervisors "stayed on Cook County's clock while engaging in personal business away from the office." 258 F.3d at 665. The Wallscetti court held that the plaintiff's statements were only constitutionally protected insofar as they alleged that certain employees had "le[ft] the office early." Id. at 667. In making this determination, the court stated that the public at large would not be "genuinely interested" in a "private personnel dispute."

The Supreme Court's decision in Connick v. Myers, 461 U.S. 138 (1983), is also instructive on this issue. Connick involved an assistant district attorney who was fired after she distributed "a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." Id. at 141. As to the questions contained in the questionnaire regarding "the confidence and trust that Myers' coworkers possess in various supervisors, the level of office morale, and the need for a grievance committee," the Supreme Court stated that, "we do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official." Id. at 148. The Court did hold that one question contained in the questionnaire--whether staff members at the district attorney's office felt pressure to engage in political activities--was on a matter of public concern, because of the "demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." Id. at 149. In the end, however, the Court held that "Myers' questionnaire touched upon matters of public concern in only a most limited

9

sense," and that "[t]he limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." Id. at 153.

The court concludes that the content of Sousa's speech reveals a "private personnel dispute" in which the public at large would have little genuine interest. The questionnaire distributed in Connick contained various questions about a perceived "rumor mill active in the office," the need for a "grievance committee," and morale within the district attorney's office. See 461 U.S. at 155-56. Similarly, in his deposition, Sousa discussed "mobbing," stating that the practice "primarily" consisted of coworkers "ganging up on people, talking behind their backs, spreading rumors." Sousa Dep. at 89:6-10. In Sousa's view, "mobbing," which is the primary subject of the speech that is the basis for Sousa's First Amendment retaliation claim, also consisted of other "very subtle things," such as "slamming file drawers," passing out "the wrong mail," and blocking other cars in the parking lot. Id. at 89:13, 16-17, 92:4; see also id. at 89:16-17 ("[T]here's so many ways for people to get under other people's skin."). The court concludes that complaints about such matters might be of interest to Sousa as a DEP employee,[5] but would not be of interest to the public.

---

[5] And, to a limited extent, on Sousa's co-workers. Sousa's Complaint states that, "beginning in 2001, [he] frequently spoke out on matters of public concern voicing workplace violence among his peer and colleagues at the DEP. Among the persons with whom [he] communicated was Attorney General Richard Blumenthal." Complaint at ¶ 12. Indeed, Sousa has submitted some evidence regarding workplace conflicts at the DEP not involving Sousa. See, e.g. Email from Carol Ladue to Michael Harder dated July 31, 2002; Memorandum from Kenneth W. Major dated April 30, 2003; Sousa Dep. at 84:16-85:6.

However, the record contains no evidence that Sousa himself spoke out "frequently" on "workplace violence" among his peers. See infra at p. 11. Sousa's letter to Attorney General Blumenthal, for instance, contains no information about "workplace violence" among his peers. The letter mentions Sousa's 2002 altercation with Jonathan Goldman, and notes "widespread harassment and 'mobbing' problems at the DEP," but contains no information beyond Sousa's own situation. See infra, n. 7.

It is bears noting that, while Sousa repeatedly states that the speech at issue in this case was on the subject of "workplace violence," the record reveals only one occurrence that can reasonably be defined as "violence."  On October 31, 2002, Sousa was "involved in a physical and verbal altercation with a co-worker[,] Jonathan Goldman."  L.R. 56(a)(1) at ¶ 9.  Following the altercation, Sousa and Goldman were both suspended from work for three days.[6]  Id. at ¶ 12.  However, beyond the one altercation with Goldman, Sousa has not presented any evidence reasonably indicating that "workplace violence" was occurring at the DEP.  Sousa appears to claim that "mobbing" is a form of "workplace violence."  While the court acknowledges that "workplace violence" may well be a matter of public concern, see, e.g. Vizcarra v. Chou, 2007 WL 4790813, at *6 (C.D. Cal. 2007) (addressing claims for retaliation over speech regarding, inter alia, "workplace violence" and noting that such speech "potentially reveal[s] widespread mismanagement and disregard for employee safety"), the court concludes that the activities Sousa defines as "mobbing," as discussed above, cannot plausibly be defined as "violence."

The court also concludes that the context of Sousa's speech reveals a "private personnel dispute" in which the public would have little genuine interest. It is clear that, as in Wallscetti, Sousa's complaints "were made during the course of an apparently long-running dispute with [his] immediate supervisors."  258 F.3d at 667.  The

---

[6] Both parties "claimed that the other party started it, and it appeared from outside witnesses that both parties had had the opportunity to walk away from the confrontation and declined."  L.R. 56(a)(1) at ¶ 10.

chronology contained in Sousa's letter to Attorney General Blumenthal begins with a description of an email "concerning a longstanding and seeming irresolvable dispute between two person's assigned to his (Sousa's work group)." See infra, n. 7. As the Wallscetti court stated, speech in the context of such a long-running dispute "indicates that the speech was not directed toward airing a matter of public concern." 258 F.3d at 667.

The form of Sousa's speech also reveals a "private personnel dispute." Sousa's statements at issue in this case were made, in large part, to the office of the DEP commissioner. Indeed, Sousa "appealed to Rocque and Stahl out of necessity regarding continuing workplace violence issues and unethical and retaliatory behaviors on the part of Evans and his staff." Affidavit of Bryan Sousa at ¶ 84 (hereinafter "Sousa Aff."). The Wallscetti court similarly stressed that "[t]he form of Wallscetti's speech, contacting her supervisors' internal superiors rather than attempting to bring the harassment into view of those outside the County's administrative structure, further supports finding that her complaints are not protected." 258 F.3d at 662. In this case, it appears that Sousa's letter to Attorney General Blumenthal was his only attempt to bring his complaints to the attention of those outside the DEP. However, Sousa's letter to Blumenthal was concerned principally with Sousa's own dissatisfaction at work and his desire to transfer to another DEP location or to be placed on paid leave status, and did not contain allegations that would be of interest to the public at large. See infra, n. 7.

In his Supplemental Memorandum in Opposition to the defendants' Motion for Summary Judgment, Sousa appears to analogize the instant case to Gorman-Bakos, in

which the Second Circuit held that "claims . . . based on alleged mismanagement of government funds and violations of its by-laws . . . are clearly matters of public concern." 252 F.3d at 553 n.4.  However, Gorman-Bakos is distinguishable from the instant case.  In Gorman-Bakos, the plaintiffs claimed that their volunteer status with and participation in a particular "4-H club" was terminated in retaliation for statements made about, inter alia, "animal science funding" and "horse-related safety guidelines." Id. at 549-50.  Indeed, it is well-established that claims related to financial mismanagement fall squarely within the ambit of "public concern."  See id. at 553 n.4 (citations omitted).  The same is true as to matters of public safety.  Gorman-Bakos at 553 n.4; see also Vasbinder v. Ambach, 926 F.2d 1333, 1339 ("An employee's charge of unlawful conduct . . . is given far greater weight in the balancing exercise than is a complaint as to the fairness of internal office operations.").

In this case, however, the record indicates that Sousa's complaints were at most only slightly and indirectly, if at all, tied to financial mismanagement or public safety.  Sousa describes his December 5, 2003 letter to Attorney General Blumenthal as a "comprehensive document" describing his complaints about the DEP to that point.  Sousa Aff. at ¶ 26.  However, that letter contains no reference to the mismanagement of public funds, or any other issue in which, in this court's view, the public at large would be genuinely interested.  Pl.'s Exh. 56.[7]  To the contrary, the letter "would convey no

---

[7] Sousa's letter to Blumenthal contains what it describes as a "brief chronology of retaliatory actions that ha[d] recently been taken against [Sousa] by both the DEP and its staff apparently due to my outspoken nature and direct approach in performing my job function to the best of my ability and in the best interest of the State of Connecticut" (emphasis removed).  The chronology begins in August of 2003 and ends in October of that same year.  It details email correspondence sent by Sousa regarding "mobbing," the DEP's attempts to subject Sousa to a psychiatric evaluation, DEP's placement of Sousa on unpaid leave, and a lawsuit filed against Sousa by Jonathan Goldman, a former co-worker.  The letter

information at all other than the fact that a single employee is upset with the status quo." Connick, 461 U.S. at 148.

In sum, Sousa's speech "touched upon matters of public concern in only a most limited sense." Id. at 154. Indeed, Sousa's statements are aptly characterized as "employee complaints over internal office affairs." Connick, 461 U.S. at 149. The court therefore places a minimal value on Sousa's protected activity.

### 2.   Interests of the DEP as an Employer

With regard to the second aspect of the Pickering balancing test, " 'the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.' " Id. at 151 (quoting Arnett v. Kennedy, 416 U.S. 134, 168 (1974)); see also Weintraub v. Board of Education, __ F.3d __, 2010 WL 292663, at *3 (2d Cir. 2010) ("A public employee . . . must by necessity accept certain limitations on his or her freedom, because, his or her speech can contravene governmental policies or impair the proper performance of governmental functions.") (internal quotation marks and citation omitted); Locurto v. Giuliani, 447 F.3d 159, 163 (2d Cir. 2006) ("The Government as an employer, and hence as a consumer of labor, must retain some freedom to dismiss employees who do not meet the reasonable requirements of their jobs."). However, "[t]o satisfy Pickering and justify adverse action arising out of an employee's protected activity, the government has the burden to show that the employee's activity is disruptive to the

---

concludes with a request for Blumenthal's "assistance in facilitating [Sousa's] immediate transfer to another location or the implementation of a paid leave status" (emphasis removed).
    In sum, Sousa's letter to Blumenthal was concerned principally with Sousa's own dissatisfaction at work and his desire to transfer to another DEP location or to be placed on paid leave status.

14

internal operations of the governmental unit in question." Melzer, 336 F.3d at 197; see also Connick, 461 U.S. at 151 ("[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch."). Because the court has placed only minimal value on Sousa's protected activity, "the government's burden, at the balancing stage, is at its lowest." Blackman, 491 F.3d at 99.

In "striking the balance" between a plaintiff's First Amendment rights and the rights of a state-employer, the court must consider "whether the speech impaired the employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing agency." Rookard v. Health and Hospitals Corp., 710 F.2d 41, 46 (2d Cir. 1983). In satisfying this burden, the state need not show an actual disruption of its work environment, as long as it shows a "likely interference with its operations." Lewis, 165 F.3d at 163; see also Melzer, 336 F.3d at 197 ("Any actual disruption that has already occurred is of course a persuasive argument for the government that it has met its burden, but even a showing of probable future disruption may satisfy the balancing test, so long as such a prediction is reasonable."). However, "[t]he disruption must be significant enough so that it 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships . . . or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' " Id. at 197 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

Cases in which the government has failed to meet its burden are easily distinguishable from this case. In Pickering, for instance, the public employee at issue was a schoolteacher who was fired after he sent a letter to a local newspaper "that was critical of the way in which the [School] Board and the district superintendent of schools had handled past proposals to raise new revenue for schools." Pickering, 391 U.S. at 564. The Supreme Court held that the statements contained in the appellant's letter were "in no way directed towards any person with whom [he] would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers [was] presented." Id. at 569-70. The Court noted the lack of "close working relationships" between the appellant and the School Board "for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." Id. at 570.

Similarly, Vasbinder involved an employee of the New York State Department of Education's Office of Vocational Rehabilitation ("OVR") who reported to the FBI "his suspicions of wrongdoing in a federally funded program overseen by OVR." 926 F.2d at 1335. After the employee informed his superiors "that he had spoken to the FBI, his [work performance] evaluations . . . deteriorated dramatically." Id. at 1336. Despite receiving "a false and damaging performance review" and ultimately a demotion, id. at 1337, the "[d]efendants made little effort to show that Vasbinder's going to the FBA in any way impeded the efficiency of OVR operations." Id. at 1340.

In this case, by contrast, it is clear that Sousa was highly disruptive to internal operations at DEP towards the end of his tenure there. First, beginning in roughly

16

January 2004, supervising Sousa became a "became a full-time job" for Smith, Sousa's immediate supervisor.[8]  L. R. 56(a)(1) at ¶ 81.  Smith testified that, due to the amount of time she was forced to spend responding to correspondence sent by Sousa, she "was not able to do [her] other real job," which involved supervising three other individuals and working on a project of her own.  Smith Dep. at 43:12-24.  Second, Sousa interfered with the Office of the DEP Commissioner by continuing to send correspondence to that Office despite being informed by a supervisor "not to send draft work product to the Commissioner, or anyone else, until the work was vetted and reviewed by the unit."[9]  See L. R. 56(a)(1) at ¶ 85.  Third, Sousa made accusations of "mobbing" against members of the Ombudsman's office, and threatened to sue

---

[8] Sousa's Local Rule 56(a)(2) Statement does not deny this assertion; rather, it states that "Plaintiff lacks sufficient information to agree or disagree."  L. R. 56(a)(2) at ¶ 81.  Therefore, the assertion contained in L.R. 56(a)(1) must be "deemed admitted."  See Local Civil Rule 56(a) ("All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)2.").
 While Sousa's Affidavit calls Smith's assertion "nonsense," the Affidavit also states that "Smith's lack of qualifications may explain her expressed difficulties in managing me, as might the explanation that she was deliberately mischaracterizing my performance and level of independence."  See Sousa Aff. at ¶ 81.  The court construes this as a dispute over the basis of the fact--but not with the fact itself--that, for Smith, managing Sousa was a full time job. The court additionally notes that Sousa's Affidavit states that "the record shows" that Sousa "perform[ed] work successfully and independently on [his] own."  Id.  However, Sousa cites no evidence to contradict Smith's assertion that managing Sousa was a "full time job."
 In sum, there is no evidence--in Sousa's Affidavit or otherwise--that "set[s] out specific facts showing a genuine issue" as to whether managing Sousa was a "full time job" for Smith.  See, Fed. R. Civ. P. 56(e)(2) (stating that the nonmoving party in a motion for summary judgment must "set out specific facts showing a genuine issue for trial").

[9] Sousa's Local Rule 56(a)2 Statement does not deny this assertion, stating that "Plaintiff lacks sufficient information to agree or disagree."  See L.R. 56(a)(2) at ¶ 85.  Sousa's Affidavit merely states that, "[i]f Stahl indeed directed Kaliszeski to instruct me to 'follow the chain of command', this suggests that she and/or Rocque deliberately wished to suppress my allegations against Evans and his henchpersons   . . ."  Sousa Aff. at ¶ 85.

17

Kaliszewski.  L. R. 56(a)(1) at ¶ 92.[10]  Smith filed a written, hostile-work-environment claim at one point, informing Evans that she felt unsafe around Sousa.  Pl.s' 56(a)(1) at ¶¶ 95, 97.  Fourth, Sousa was extremely uncooperative in scheduling an independent medical evaluation, which the DEP sought in order to determine whether Sousa was medically fit to return to work full time.  Sousa failed to attend, or showed up late to, multiple appointments with the doctor who was appointed by the DEP to conduct the medical evaluation.  See, e.g., id. at ¶¶ 134,[11] 145.

### 3. Balancing

Pursuant to the Second Circuit's suggestion, this court has assumed arguendo that Sousa has satisfied the "public concern" requirement.  Second Circuit precedent indicates that such an arguendo assumption is appropriate in cases where "the 'matters of public concern' issue is close but the task of balancing interests does not appear to be a difficult one."  Blackman, 491 F.3d at 100 n.5 (2d Cir. 2007).  Indeed, the court concludes that Pickering balancing favors the defendants' position.  On one side, the state's interest in an efficient and productive DEP was clearly impaired by the disruptions caused by Sousa.  On the other, the First Amendment value of Sousa's expression, which was concerned almost entirely with a long-running and private dispute between Sousa and certain of his co-workers, was minimal.  Indeed, there is no issue of material fact as to whether Sousa's 'interest in free comment is outweighed by

---

[10] While Sousa denies ever having threatened to "seek to revoke [Kaliszewski's] law license," as is alleged by the defendants, see  L. R. 56(a)(1) at ¶ 92; L. R. 56(a)(2) at ¶ 92, Sousa does not deny that he threatened to sue Kaliszewski.  See L. R. 56(a)(2) at ¶ 92.

[11] Sousa does not deny the portion of Paragraph 134 asserting that Sousa showed up 45 minutes late to an August 23, 2004 appointment with Dr. Trape.  See L.R. 56(a)(2) at ¶ 134; Sousa Aff. at ¶ 134.

the State's interest in the efficiency of its public services.' " <u>Sousa</u>, 589 F.3d at 175 n.8 (citation omitted).  Summary judgment is thus granted in the defendants' favor.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 18th day of March, 2010.

/s/
Janet C. Hall
United States District Judge